47 F.3d 212
 Kevin PERKINS and Robert McCoy, Plaintiffs-Appellants,
and
Ron Harper and William Elliot, Plaintiffs-Appellees,
v.
CITY OF CHICAGO HEIGHTS, Chicago Heights Election
Commission, Chicago Heights Park District, et al.,
Defendants-Appellees.
 No. 94-2491.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 9, 1994.
Decided Feb. 7, 1995.*
Rehearing and Suggestion for Rehearing En Banc
Denied March 31, 1995.
 
 Michael P. Seng, Chicago, IL, James E. Craven, Donald M. Craven (argued), Springfield, IL, for Ron Harper, William Elliot.
 Robert L. Anderson (argued), Krohn, Jenkins & Anderson, Chicago, IL, for Kevin Perkins, Robert McCoy.
 James J. Casey, Kai A. Nebel, Kathleen M. O'Laughlin, Keck, Mahin & Cate, Anthony G. Scariano, Raymond A. Hauser (argued), Jon Gardner Crawford, Kelly A. Hayden, Scariano, Kula, Ellch & Himes, Chicago, IL, for City of Chicago Heights, Chicago Heights Election Com'n, Stanley Kusper.
 James J. Casey, Kai A. Nebel, Kathleen M. O'Laughlin, Edward M. Kay, James T. Ferrini, Susan Condon, Imelda Terrazino, Clausen, Miller, Gorman, Caffrey & Witous, Anthony G. Scariano, Chicago, IL, for Chicago Heights Park Dist.
 Before FLAUM, EASTERBROOK, and ROVNER, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 Two named plaintiffs in a class action appeal a consent decree entered in a Voting Rights case as violative of the Voting Rights Act and the Fourteenth and Fifteenth Amendments. Because the parties to the consent decree lacked the authority to assent to it, and the requisite findings of federal law violations necessary for the district court to approve the decree were not established, we now vacate that decree.
 
 I.
 
 2
 Kevin Perkins and Robert McCoy, plaintiffs-appellants in the instant case, and Ron Harper and William Elliot (all together the "Class"), filed a Complaint for Injunctive and Other Equitable Relief against the City of Chicago Heights and the Chicago Heights Election Commission on June 8, 1987. The complaint alleged that Chicago Heights' non-partisan, at-large district wide elections used to elect representatives to the Chicago Heights City Council violated section 2 of the Voting Rights Act of 1965, 42 U.S.C. Sec. 1971 et seq., by diluting the opportunity of African-Americans to elect representatives of their choice. On November 17, 1988, the Class filed a complaint alleging similar violations against the Chicago Heights Park District and Stanley Kusper, Clerk of Cook County, Illinois.
 
 
 3
 On January 29, 1988, the Class filed a Motion to Maintain a Class Action and for Certification of the Class supported by affidavits of Harper, Elliot, McCoy and Perkins. This motion was formally granted on April 18, 1994, with the class defined as:
 
 
 4
 All African-American citizens of the United States residing in the geographic confines of 1) The City of Chicago Heights, or 2) The Chicago Heights Park District.
 
 
 5
 Regarding the six year delay in granting class certification, Judge Will, to whom the case had been transferred from Judge Nordberg, stated:
 
 
 6
 I talked to Judge Nordberg, and Judge Nordberg was of the opinion that he had certified the class way back when, when the motion for class certification was originally filed.... Well, he said I certainly intended to. And if I didn't it was an omission, and I am perfectly agreeable to your certifying the class now since that's what I intended to do.
 
 
 7
 Since it made sense to me to certify the class, because this was a class action from day one, and all that happened was that Judge Nordberg hadn't entered the order which he thought he had entered, and therefore I certified the class sometime ago at this point.
 
 
 8
 In February, 1989, all parties moved for summary judgment. On January 28, 1992, Magistrate Judge W. Thomas Rosemond, Jr. issued a Report and Recommendation suggesting that the district court should grant summary judgment for the Class on the following issues: 1) whether the African-American community in Chicago Heights was sufficiently compact and contiguous to form a voting age population majority in two of seven districts; and 2) whether voting in Chicago Heights was racially polarized.
 
 
 9
 Judge Nordberg adopted the Magistrate Judge's findings on May 14, 1993. In addition, Judge Nordberg entered summary judgment for the Class on the issue of whether the white majority in Chicago Heights voted sufficiently as a block to defeat usually the African-American community's preferred candidates. The court did not enter a finding of liability against the defendants, however, finding instead that genuine issues of material fact still existed as to the following questions: 1) whether the at-large system in Chicago Heights enhanced discrimination against African-Americans; 2) whether African-Americans were denied access to the slating process; 3) whether African-Americans were the victims of official discrimination in the form of political gerrymandering; and 4) whether African-Americans bore the effects of historic socioeconomic discrimination in the areas of housing, employment, education, and public accommodations that hindered their ability to participate effectively in the Chicago Heights political process.
 
 
 10
 The parties filed an Agreed Motion to Consolidate the two cases against Chicago Heights and against the Park District. The court granted that motion on September 13, 1993. The case was reassigned to Judge Will, who held pretrial mediation conferences with the parties, all of whom submitted proposed voting maps. As a result of these negotiations the parties agreed to a consent decree that included a new voting map consisting of six single member districts and revised forms of government for the City and the Park District. On January 6, 1994, Perkins and McCoy filed a motion objecting to their being disregarded as named plaintiffs during settlement negotiations. Judge Will denied this motion as lacking justification the same day.
 
 
 11
 The parties held a public hearing on April 25, 1994, at the Chicago Heights Municipal Building. The proceeding was taped, transcribed, and presented at a fairness hearing conducted by Judge Will on May 18, 1994. Judge Will approved the parties' consent agreement and entered findings of fact, conclusions of law and a judgment order on May 24, 1994. The consent decree changes the City's form of government from a "Managerial Form of Municipal Government," 65 ILCS 5/5-1-1 et seq., to a "Strong Mayor Form of Municipal Government," 65 ILCS 5/6-1-1 et seq. Pursuant to the consent decree, Chicago Heights will have a mayor elected at-large. 65 ILCS 5/6-3-3. However, the consent decree modifies the statutory Strong Mayor Form of Government in several ways. First, instead of having 5 wards with 2 aldermen elected from each ward, 65 ILCS 5/6-3-3 and 6-3-5, Chicago Heights will have 6 districts with one alderman elected from each. Furthermore, instead of electing the City Clerk and Treasurer, 65 ILCS 5/6-3-3, the mayor will appoint people to fill those positions and the City Council will confirm them. Finally, although only statutorily authorized for municipalities with populations above 50,000, 65 ILCS 5/6-4-12 and 5/6-4-13, Chicago Heights, a city of approximately 33,000, will have administrative assistants to the mayor, as well as a Budget and Finance Director, all to be appointed by the mayor and to work at his pleasure.
 
 
 12
 The consent decree also modifies the statutorily defined form of government for Illinois Park Districts. See 70 ILCS 1205/1-1 et seq. Among other things, the decree calls for six Commissioners, one from each district, to be elected to four year terms, rather than five Commissioners to be elected at-large to six year terms. The decree also provides for a Commission President to be elected at-large. Finally, the consent decree states that the Chicago Heights Park District Board "shall" pass a resolution, as allowed by 70 ILCS 1205/2-10a and 2-12a, mandating that the Board will consist of seven Commissioners elected to four year terms.
 
 
 13
 Perkins and McCoy moved for a new trial, which the district court denied. This appeal followed.
 
 II.
 
 14
 Perkins and McCoy argue that the consent decree violates the Voting Rights Act and the Fourteenth and Fifteenth Amendments. Specifically, Perkins and McCoy contend that the six districts have a population variance of more than 10% and fail to respect traditional natural and political boundaries. See Karcher v. Daggett, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983); Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), modified, 411 U.S. 922, 93 S.Ct. 1475, 36 L.Ed.2d 316 (1973); Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). In addition, Perkins and McCoy maintain that the modification of the statutory Strong Mayor Form of Government dilutes their voting power by ordering six instead of five districts and by mandating the appointment rather than election of the City Clerk and Treasurer. Alternatively, they argue that the changes to the statutory form are illegal. Finally, Perkins and McCoy assert that the consent decree is invalid because the other named plaintiffs, Elliot and Harper, failed to represent the Class adequately and because there is insufficient evidence to prove that the Class was certified before 1994. Because we believe that the parties did not have the ability to consent to the modifications contained in the consent decree, we vacate the decree and remand.[1]
 
 
 15
 While parties can settle their litigation with consent decrees, they cannot agree to "disregard valid state laws," People Who Care v. Rockford Bd. of Educ., 961 F.2d 1335, 1337 (7th Cir.1992); Kasper v. Bd. of Election Com'rs of City of Chicago, 814 F.2d 332, 341 (7th Cir.1987), and cannot consent to do something together that they lack the power to do individually. Kasper, 814 F.2d at 341-42. We have previously recognized that "[s]ome rules of law are designed to limit the authority of public officeholders, to make them return to other branches of government or to the voters for permission to engage in certain acts. They may chafe at these restraints and seek to evade them," Dunn v. Carey, 808 F.2d 555, 560 (7th Cir.1986), but they may not do so by agreeing to do something state law forbids. Because a consent decree is not just an agreement between two parties, but is also a judicial act, district courts must ensure that the consent decrees they approve respect this principle as well as the rights of third parties. EEOC v. Hiram Walker & Sons, 768 F.2d 884, 889 (7th Cir.1985), cert. denied, 478 U.S. 1004, 106 S.Ct. 3293, 92 L.Ed.2d 709 (1986); South v. Rowe, 759 F.2d 610, 613 n. 3 (7th Cir.1985).
 
 
 16
 Once a court has found a federal constitutional or statutory violation, however, a state law cannot prevent a necessary remedy. Under the Supremacy Clause, the federal remedy prevails. "To hold otherwise would fail to take account of the obligations of local governments, under the Supremacy Clause, to fulfill the requirements that the Constitution imposes on them." Missouri v. Jenkins, 495 U.S. 33, 57-58, 110 S.Ct. 1651, 1666, 109 L.Ed.2d 31 (1990). Thus, upon properly supported findings that such a remedy is necessary to rectify a violation of federal law, the district court can approve a consent decree which overrides state law provisions. Without such findings, however, parties can only agree to that which they have the power to do outside of litigation. As we have stated before, "[a]n alteration of the statutory scheme may not be based on consent alone; it depends on an exercise of federal power, which in turn depends on a violation of federal law." Kasper, 814 F.2d at 342 (emphasis added); see also Ragsdale v. Turnock, 941 F.2d 501, 515 (7th Cir.1991) (" '[T]he appropriate relation between state and national power' ... is one in which federal judges employ their equitable powers to enjoin the enforcement of state statutes only after they have determined that these statutes contain some constitutional deficiency.") (Flaum, J., concurring in part and dissenting in part) (emphasis in original) (citation omitted), cert. denied, 502 U.S. 1035, 112 S.Ct. 879, 116 L.Ed.2d 784 (1992); Overton v. City of Austin, 748 F.2d 941, 957 (5th Cir.1984) ("Absent a properly grounded judicial determination that the present charter provisions are illegal, the consent of the parties provides an insufficient basis on which to judicially ordain a different system of council election and composition.").
 
 
 17
 The Illinois Constitution states that home rule units, such as Chicago Heights:
 
 
 18
 shall have the power subject to approval by referendum to adopt, alter or repeal a form of government provided by law, ... A home rule municipality shall have the power to provide for its officers, their manner of selection and terms of office only as approved by referendum or as otherwise authorized by law....
 
 
 19
 Ill. Const. art. VII, Sec. 6(f) (emphasis added). Therefore, a change to the Strong Mayor Form of Government, and at least certain modifications to that statutory system, must normally be accomplished through a referendum. The district court, in approving the consent decree, stated that "this Consent Decree and Order is supported by a significant basis in evidence and law, and its measures are narrowly tailored to achieve the necessary remedy." The decree states that it should not be construed as an admission of liability by Chicago Heights. These generalized statements do not constitute sufficient findings of a violation of federal law and cannot adequately form the basis for the modifications of the Illinois statutory forms of government. Therefore, absent particularized findings, the decree could not direct changes normally requiring voter approval and we must vacate the decree and remand for further proceedings.[2]
 
 
 20
 On remand, the parties may either attempt to reach a new agreement in light of our discussion above or may proceed to trial. If they choose the former option, the parties can, after a finding of a Voting Rights Act violation, adopt, and the district court can approve, one of the alternative forms of government provided by Illinois law. However, the parties cannot modify the chosen form simply at-will. Remedies that override state law must be narrowly tailored so as to infringe state sovereignty as minimally as possible. Jenkins, 495 U.S. at 57-58, 110 S.Ct. at 1666-1667. Federal remedial powers can "be exercised only on the basis of a violation of the law and [can] extend no farther than required by the nature and extent of the violation." General Bldg. Contractors v. Pennsylvania, 458 U.S. 375, 399, 102 S.Ct. 3141, 3154, 73 L.Ed.2d 835 (1982). Any modifications which must be accomplished through a referendum[3] cannot be made by the consent decree unless the court finds that the statutory provisions would violate federal law and that such changes are necessary to ensure compliance with federal law. In that case, appropriate changes need not be postponed until a violation actually occurs.
 
 
 21
 Park districts, on the other hand, are not home rule units subject to Article VII, Sec. 6. As "special districts" they are "units of local government," Ill. Const. art. VII, Sec. 1, for which:
 
 
 22
 The General Assembly shall provide by law for the transfer of assets, powers, and functions ... in connection with the formation, consolidation, merger, division, dissolution and change in the boundaries of
 
 
 23
 . . . . .
 
 
 24
 Ill. Const. art. VII, Sec. 12. The Constitutional Commentary to this section states that it is designed to "provide by law for the implementation of changes in the organization and boundaries of units of local government." (emphasis added) Thus, the organization of the Chicago Heights Park District can normally only be altered in the ways and by the methods authorized by the Illinois General Assembly. The Illinois Revised Statutes allow the Park District Board to change the number of Commissioners and terms of office by board resolution or by referendum. 70 ILCS 1205/2-10a and 2-12a. The statutes mention nothing, however, about electing Commissioners from districts rather than at-large. Absent a specific finding that the Park District system violates the Voting Rights Act and that such changes are necessary to remedy that violation, the district court erred in approving this portion of the consent decree.[4]
 
 
 25
 Perkins and McCoy argue that we must vacate the consent decree because its districts and modifications violate the Voting Rights Act and the United States Constitution, or in the alternative that the six districts it mandates violate the Illinois statutory requirement of five districts. See 65 ILCS 5/6-3-6. Perkins and McCoy do not, however, argue that the Illinois Constitution and our precedent such as Kasper require our result today. The Class-appellees contend that such absence constitutes a waiver of the argument.[5] We do not agree. Perkins and McCoy's alternative argument minimally sufficed to preserve the issue for appeal; their failure to cite the correct cases simply created the risk that we would not find them. See, e.g., Elder v. Holloway, --- U.S. ----, ----, 114 S.Ct. 1019, 1023, 127 L.Ed.2d 344 (1994). In any event, Perkins and McCoy did not appeal the portions of the consent decree relating to the Park District and, while we often hold arguments waived, in this case, where the district court approved a consent decree that modified a form of government without the state-mandated voter approval and without making the requisite findings of violations of federal law necessitating such changes, we will not find waiver. Perkins and McCoy have standing to appeal the decree and we refuse to "prolong the injury caused by [the] consent decree arrived at through an unfair process by failing to invalidate it sooner rather than later," when a different aggrieved party may make the argument. Ragsdale, 941 F.2d at 512 (Flaum, J., concurring in part and dissenting in part). As a federal court, we "must preserve the appropriate relation between state and national power," Id. at 515 (citing Kasper, 814 F.2d at 340), a task we cannot ignore simply because Perkins and McCoy failed to make the correct legal argument.
 
 
 26
 For the foregoing reasons, we vacate the consent decree and remand for further proceedings.
 
 
 27
 VACATED.
 
 
 
 *
 This opinion was originally released in typescript
 
 
 [1]
 Although done regrettably late, we find no prejudicial error in the district court's delay in certifying the Class. All parties treated the case as a class action from the beginning and the Judges involved believed that a formal order to that effect had been entered. The court eventually certified the Class, before the court approved the consent decree. Nothing in the record persuades us either that the Class was not properly certified or that Elliot and Harper did not adequately represent the Class. We therefore find Perkins and McCoy's arguments to the contrary without merit
 
 
 [2]
 Because we vacate the decree we do not reach Perkins and McCoy's other contentions, which may be rendered moot by further proceedings
 
 
 [3]
 See Dunne v. County of Cook, 108 Ill.2d 161, 90 Ill.Dec. 866, 868, 483 N.E.2d 13, 15 (1985) (suggesting that the number of districts and number of members from each district would be an alteration necessitating a referendum). In addition, the appointment, rather than election, of the City Clerk and Treasurer would constitute a decision on the manner of selection of officers, if those positions are "officers" within the constitutional meaning of the term. We note that one court has stated that a city can, consistent with the Illinois Constitution, first alter a statutory form by ordinance and then adopt that form through a referendum. Flowers v. City of Moline, 251 Ill.App.3d 348, 190 Ill.Dec. 628, 631, 622 N.E.2d 38, 41 (1993). Assuming that all changes can be approved of in a single referendum does not mean that all possible alterations can also be made in a consent decree. Rather, the parties must do only what is necessary to remedy any federal law violation and must submit all other desired changes to the City's voters for approval
 
 
 [4]
 The consent decree provides that any provision found to be unconstitutional can be severed from the remainder of the decree. Our decision, however, necessarily requires vacating the entire decree
 
 
 [5]
 In their Motion for a New Trial, Perkins and McCoy argued that the modifications to the Strong Mayor Form of Government and Park District organization so derogated from the statutory forms as to be illegal. The City's attorney assured the district court that municipalities can make such alterations in order to settle Voting Rights litigation. Our discussion above establishes otherwise and we have found no authority to the contrary. We further note that no party apprised the district court of the Illinois constitutional provisions on which we have relied